BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
PAULA R BROWN (254142)
JENNIFER L. MACPHERSON (202021)
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
pbrown@bholaw.com
jmacpherson@bholaw.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| HOMAYOUN SADDR ARHAMI, individually, and on behalf of all others similarly situated, | Case No.  2:23-cv-01299 |
| Plaintiff, | **CLASS ACTION** |
| v. | **CLASS ACTION COMPLAINT** |
| HERITAGE PROVIDER NETWORK, INC.; REGAL MEDICAL GROUP, INC., a California corporation, | |
| Defendants. | **JURY TRIAL DEMANDED** |

BLOOD HURST & O' REARDON, LLP

1
2
3
4
5
6

Plaintiff Homayoun Sadr-Arhami, individually and on behalf of the general public and all others similarly situated (the "Class members"), by and through his attorneys, upon personal knowledge as to facts pertaining to himself and on information and belief as to all other matters, brings this class action against Defendants Heritage Provider Network, Inc. and Regal Medical Group, Inc., and alleges the following:

7

<u>**NATURE OF THE CASE**</u>

8
9
10
11
12
13
14
15
16
17
18
19

1.     Defendant Heritage Provider Network, Inc. administers healthcare through several medical groups, including Regal Medical Group, Inc.; Lakeside Medical Organization; ADOC Medical Group; and Greater Covina Medical. On or about December 1, 2022, cybercriminals used malware to access the servers of all four medical groups, accessing and exfiltrating the highly confidential and sensitive personal and medical information of more than 3.3 million customers (the "Data Breach"). According to Defendants, the personal information the cybercriminal accessed and exfiltrated during the Data Breach included Plaintiff's and other Class members' names, social security numbers, addresses, dates of birth, medical diagnosis and treatment, laboratory rest results, prescription data, radiology reports, health plan member number and telephone number ("PII/PHI").[1]

20
21
22
23

2.     Although Defendants knew of the Data Breach at least by December 8, 2022, it waited two months to notify its customers. During this two month delay, the cybercriminals had full access to and use of Plaintiff's and Class members' PII/PHI.

24
25
26

3.     Defendants owed a duty to Plaintiff and Class members to maintain reasonable and adequate security measures to secure, protect, and safeguard the PII/PHI it collected and stored on its servers. Defendants breached that duty by,

27
28

---

[1]     https://www.regalmed.com/notice2/

BLOOD HURST & O'REARDON, LLP

00199845

*inter alia*, failing to implement and maintain reasonable security procedures and practices to protect the PII/PHI from unauthorized access.

4.    The Data Breach happened because of Defendant's inadequate cybersecurity, which caused Plaintiff's and Class members' PII/PHI to be accessed and exfiltrated. This action seeks to remedy these failings. Plaintiff brings this action on behalf of himself and all affected California residents. As set forth in the Prayer for Relief, among other things, Plaintiff seeks injunctive relief and statutory and actual damages.

## **VENUE AND JURISDICTION**

5.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, because this is a proposed class action in which there are more than 100 class members, the combined claims of class members exceed $5,000,000, and at least one member of the plaintiff Class and Defendants are citizens of different states.

6.    This Court has personal jurisdiction over Defendants because Defendants are authorized to and regularly conduct business in the State of California. Defendants also have sufficient minimum contacts to render the exercise of jurisdiction by this Court proper and necessary.

7.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District.

## **PARTIES**

8.    At all relevant times, Plaintiff Homayoun Sadr-Arhami resided in Winnetka, California. Plaintiff is a patient of Defendant Regal Medical Group. To receive medical care and related services from Defendants, plaintiff provided his PII/PHI to Defendants and reasonably believed that Defendants would take reasonable steps to safeguard the PII/PHI. On February 6, 2023, Defendants notified Plaintiff that his PII/PHI was accessed and exfiltrated by unauthorized users as a result of a malware attack on Defendants' servers. Following the Data

BLOOD HURST & O'REARDON, LLP

Breach, Plaintiff has spent time monitoring his accounts and personal information for unusual activity.

9.    As a result of Defendants' failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the personal information it collected and maintained, Plaintiff's PII/PHI was accessed and exfiltrated, stolen and otherwise disclosed in the Data Breach.

10.    Heritage Provider Network, Inc. ("HPN") is a corporation organized under the laws of the state of California, with its principal place of business located in Marina Del Rey, California. Heritage Provider Network administers health care through medical groups throughout California, including Regal Medical Group.

11.    Regal Medical Group, Inc. ("Regal") is a corporation organized under the laws of the state of California, with its principal place of business located in Marina Del Rey, California. As an affiliate of Heritage Provider Network, Regal Medical Group is one of the largest physician-led healthcare networks in Southern California, contracting with thousands of doctors and hundreds of hospitals and urgent care centers to provide affordable healthcare.

## **FACTUAL ALLEGATIONS**

### ***PII/PHI Is a Valuable Property Right***

12.    PII/PHI is a valuable property right.[2] California has repeatedly recognized this property right, most recently with the passage of the California Consumer Privacy Act of 2018 ("CCPA") and applicable amendments. In a Federal Trade Commission ("FCC") roundtable presentation, former Commissioner, Pamela Jones Harbour, underscored this point by observing:

---

[2]    *See* John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *2 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

BLOOD HURST & O' REARDON, LLP

00199845

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[3]

13.     The value of PII/PHI as a commodity is measurable.[4] "PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets."[5] It is so valuable to identity thieves that once PII/PHI has been disclosed, criminals often trade it on the "cyber black-market" for several years.

14.     Companies recognize PII/PHI as an extremely valuable commodity akin to a form of personal property. For example, Symantec Corporation's Norton brand has created a software application that values a person's identity on the black market.[6]

15.     As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, PII and other sensitive information directly on various Internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims. In one study, researchers found hundreds of websites displaying stolen PII and

---

[3]     Federal Trade Commission, *Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable) (Dec. 7, 2009), https://www.ftc.gov/public-statements/2009/12/remarks-ftc-exploring-privacy-roundtable.

[4]     *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market* (April 28, 2014), *available at* http://www.medscape.com/viewarticle/824192.

[5]     *See* Soma, *Corporate Privacy Trend, supra*.

[6]     Risk Assessment Tool, Norton 2010, www.everyclickmatters.com/victim/assessment-tool.html.

BLOOD HURST & O' REARDON, LLP

00199845

BLOOD HURST & O' REARDON, LLP

other sensitive information. Strikingly, none of these websites were blocked by Google's safeguard filtering mechanism – the "Safe Browsing list."

16.    PHI is particularly valuable. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security numbers and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[7] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen social security or credit card number.[8]

17.    Recognizing the high value that consumers place on their PII/PHI, some companies now offer consumers an opportunity to sell this information to advertisers and other third parties. The idea is to give consumers more power and control over the type of information they share – and who ultimately receives that information. By making the transaction transparent, consumers will make a profit from the surrender of their PII/PHI.[9] This business has created a new market for the sale and purchase of this valuable data.[10]

---

[7]    Adam Greenberg, *Health Insurance Credentials Fetch High Prices in the Online Black Market* (July 16, 2013), *available at* https://www.scmagazine.com/home/security-news/health-insurance-credentials-fetch-high-prices-in-the-online-black-market/.

[8]    Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014) *available at* https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[9]    Steve Lohr, *You Want My Personal Data? Reward Me for It*, N.Y. Times (July 16, 2010) *available at* https://www.nytimes.com/2010/07/18/business/18unboxed.html.

[10]    *See* Julia Angwin and Emil Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011) *available at* https://www.wsj.com/articles/SB10001424052748703529004576160764037920274.

CLASS ACTION COMPLAINT

00199845

18.     Consumers place a high value not only on their PII/PHI, but also on the *privacy* of that data. Researchers shed light on how much consumers value their data privacy – and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[11]

19.     One study on website privacy determined that U.S. consumers valued the restriction of improper access to their PII between $11.33 and $16.58 per website.[12]

20.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### Theft of PII/PHI Has Grave and Lasting Consequences for Victims

21.     Theft or breach of PII/PHI is serious. The United States Government Accountability Office noted in a June 2007 report on Data Breaches ("GAO Report") that identity thieves use PII to take over existing financial accounts, open new financial accounts, receive government benefits and incur charges and credit in a person's name.[13] As the GAO Report states, this type of identity theft is so harmful because it may take time for the victim to become aware of the theft and can adversely impact the victim's credit rating.

---

[11]     Janice Y. Tsai, et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study Information Systems Research* 22(2) 254, 254 (June 2011), *available at* https://www.jstor.org/stable/23015560?seq=1#page_scan_tab_contents.

[12]     II–Horn, Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at table 3, *available at* https://ideas.repec.org/p/wpa/wuwpio/0304001.html (emphasis added).

[13]     *See* GAO, GAO Report 9 (2007) *available at* http:///www.gao.gov/new.items/d07737.pdf.

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

22.   In addition, the GAO Report states that victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records … [and their] good name." According to the U.S. Federal Trade Commission ("FTC"), identity theft victims must spend countless hours and large amounts of money repairing the impact to their good name and credit record.[14]

23.   Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[15] According to Experian, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[16]

24.   According to the IBM and Ponemon Institute's 2019 "Cost of a Data Breach" report, the average cost of a data breach per consumer was $150 per record.[17] Other estimates have placed the costs even higher. The 2013 Norton

---

[14]   *See* FTC Identity Theft Website: https://www.consumer.ftc.gov/features/feature-0014-identity-theft.

[15]   The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

[16]   *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, EXPERIAN (Sept. 7, 2017), *available at* https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[17]   Brook, *What's the Cost of a Data Breach in 2019*, *supra*.

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00199845

BLOOD HURST & O' REARDON, LLP

Report estimated that the average cost per victim of identity theft—a common result of data breaches—was $298 dollars.[18]  And in 2019, Javelin Strategy & Research compiled consumer complaints from the FTC and indicated that the median out-of-pocket cost to consumers for identity theft was $375.[19]

25.    The consequences can be even more serious when the hack includes taking PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[20] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[21] "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[22]

26.    Further, medical data is more valuable than other commonly available personal data. "While a stolen credit card number might be sold for just a few cents, medical files can be worth as much as $1,000 each" or more.[23]

---

[18]    Norton By Symantec, 2013 Norton Report 8 (2013), *available at* https://yle.fi/tvuutiset/uutiset/upics/liitetiedostot/norton_raportti.pdf.
[19]    Facts + Statistics: *Identity Theft and Cybercrime*, Insurance Information Institute, *available at* https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (citing the Javelin report).
[20]    Pam Dixon, et al., *The Geography of Medical Identity Theft* (Dec. 12, 2017), https://www.ftc.gov/system/files/documents/public_comments/2018/01/00037-142815.pdf.
[21]    *See* FBI CYBER DIVISION, (U) HEALTH CARE SYSTEMS AND MEDICAL DEVICES AT RISK FOR INCREASED CYBER INTRUSIONS FOR FINANCIAL GAIN 2 (2014), *available at* https://publicintelligence.net/fbi-health-care-cyber-intrusions/ (FBI, April 8, 2014).
[22]    *See* Federal Trade Commission, *Medical Identity Theft*, *available at* http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.
[23]    Brian O'Connor, *Healthcare Data Breach: What to Know About Them and What to Do After One*, Experian (June 14, 2018),

27.    A report published by the World Privacy Form and presented at the U.S. FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services not sought nor received.

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.

28.    A person whose PII/PHI has been compromised may not see any signs of identity theft for years. According to the GAO Report:

"[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.

https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."

29. For example, in 2012, hackers gained access to LinkedIn's users' passwords. However, it was not until May 2016, four years after the breach, that hackers released the stolen email and password combinations.[24]

30. It is within this context that Plaintiff and thousands of Defendants' customers must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

### Defendants' Promises to Safeguard Customer PII/PHI

31. Heritage Provider Network (HPN) administers healthcare services throughout California through several medical groups, including Regal, Lakeside Medical Organization, ADOC Medical Group, and Greater Covina Medical. HPN prides itself on the technology it uses to manage its members and their PII/PHI on web-based platforms.

32. HPN explains that its "providers enjoy the ease of working with HPN from their medical practices using our web-portal, EZ-NET, to coordinate the referrals to HPN's specialty network." HPN guarantees that its management systems are "fully compliant to handle HIPAA transactions and maintains the healthcare data secure."[25]

33. HPN and its medical groups also utilize other web-based information management systems where "providers can conveniently view appointments, to-do lists, create documents, manage prescriptions and images as well as e-amil from one screen." HPN explains that "[t]his comprehensive system interfaces with labs,

---

[24] *See* Cory Scott, *Protecting Our Members*, LINKEDIN (May 18, 2016), *available at* https://blog.linkedin.com/2016/05/18/protecting-our-members.

[25] https://www.heritageprovidernetwork.com/?p=technology

CLASS ACTION COMPLAINT

00199845

BLOOD HURST & O' REARDON, LLP

hospitals, and pharmacies, enabling providers to coordinate care beyond the examination room."

34.     As patients seeking healthcare through HPN, Plaintiff and the other Class members have no choice but to provide their PII/PHI to HPN and its medical groups including Regal to obtain those services. Plaintiff and Class members reasonably rely on Defendants' promises to protect their PII/PHI to obtain necessary healthcare services.

35.     Given the highly sensitive and confidential nature of the information HPN and Regal obtain from Plaintiff and Class members and maintain for their business purposes, HPN and Regal promise to protect it.

36.     In HPN's "Notice of Privacy Policy," it acknowledges that HPN "is required by law to maintain the privacy and security of your protected health information" and "will not use or share your information other than as described."[26]

37.     HPN also promises on its website that is "has adopted and adheres to stringent security standards designed to protect non-public personal information at HeritageProviderNetwork.com against accidental or unauthorized access or disclosure."[27]

38.     Regal similarly promises: "All non-public personal information that you provide via our website will be used strictly for the purpose stated on the page where it is collected. RMG will not sell, license, transmit or disclose this information outside of RMG or our affiliated companies unless (1) required or permitted by law, (2) expressly authorized by you, or (3) necessary to enable RMG contractors or agents to perform certain functions for us."[28]

[26]   https://www.heritageprovidernetwork.com/files/Privacy%20Practice.pdf
[27]   https://www.heritageprovidernetwork.com/?p=privacy&t=web
[28]   https://www.regalmed.com/privacy-notice/

BLOOD HURST & O' REARDON, LLP

00199845

39.   Regal also promises that is "has adopted and adheres to stringent standards designed to protect non-public personal information at regalmed.com against accidental or unauthorized access or disclosure."

40.   HPN also makes explicit promises in its "Compliance Plan" which covers all its affiliated medical groups, including Regal.[29] HPN states:

Information Security

HPN protects its information and information system from accidental or unauthorized access, disclosure, modification, or destruction. Every employee should be familiar with HPN's policies regarding the use of electronic mail, the internet, and other forms of electronic information technology and communications.

***

HIPPAA Privacy and Security Compliance

HPN is committed to the integrity, accuracy, and confidentiality of information for the benefit of those it serves. HPN complies and expects all employees, FDRs, vendors, and persons conducting business on behalf of HPN to adhere to federal and state laws and regulations, including HIPAA and HITECH ct regarding the confidentiality of patients' medical, financial, personal and other information. Confidential patient information is not reviewed [or] disclosed without a legitimate business purpose, written authorization in accordance with HPN policies and procedures, or as otherwise required by applicable federal or state law.

***

Mitigation of Privacy and Security Violations

HPN implements policies and procedures and conducts risk analyses periodically, no less than annually, to determine potential vulnerabilities and to protect the reputational risk of the organization. All recommended changes are implemented immediately to prevent and/or reduce privacy and security vulnerabilities.

BLOOD HURST & O' REARDON, LLP

---

[29]   https://www.regalmed.com/Regal-en-us/assets/File/HPNCompliancePlan2022.pdf

41.     In providing their PII/PHI to Defendants, Plaintiff and Class members reasonably believe that Defendants will follow their stated policies and protect the PII/PHI from cybercriminals. A portion of the money Plaintiff and Class members pay for Defendants' services (either directly or indirectly through premiums charged by their insurers) are used to pay for security implemented by Defendants to protect their PII/PHI.

### *The Data Breach*

42.     Defendants provided limited details of the Data Breach in their notices to Plaintiff, Class members, and regulatory authorities. According to Defendants, the Data Breach began in or around December 1, 2022, when a cybercriminal(s) successfully placed malware onto some of Defendants' servers. The next day, some of Defendants' employees noticed difficulty accessing these servers. However, it was not until a week later, on December 8, 2022, that Defendants learned this was the result of a breach.

43.     Defendants explain that "[a]fter extensive review, malware was detected on some of our servers, which a threat actor utilized to access and exfiltrate data." Defendants estimate that more than 3.3 million customers were affected by the Data Breach.

44.     Malware is short for malicious software. It is intrusive software used by cybercriminals to steal data and damage or destroy computer systems. Examples of common malware are viruses, spyware, adware, and ransomware.

45.     Defendants stated in their notice of the Data Breach that the malware used by the cybercriminals in the Data Breach was a "ransomware attack."

46.     The U.S. Department of Health and Human Services specifically warns of ransomware attacks targeted at health information, reporting that "on average, there have been 4,000 daily ransomware attacks since early 2016 (a 300%

BLOOD HURST & O' REARDON, LLP

00199845

increase over the 1,000) daily ransomware attacks reporting in 2015)."[30]

47.     While Defendants confirmed that as a result of the ransomware attack, the cybercriminals were able to "access and exfiltrate data," Defendants have not provided any additional details of the ransomware attack.

48.     The Data Breach occurred as a result of Defendant's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect Plaintiff's and Class members' PII/PHI, including training its employees on how to detect, avoid, report and mitigate a malware attack, implementation of security practices that would prevent a malware attack in the first place, and implementation of security practices that would immediately identify and stop the malware attack.

49.     Defendants negligently left their computer systems open to attack. Thus, once the unauthorized user(s) gained access to Defendants' servers through malware, the cybercriminal had full access to the contents of those servers including Plaintiff's and Class Members' PII/PHI.

### *Defendants' Notice of the Data Breach*

50.     Defendants did not disclose the Data Breach for nearly two months. On February 1, 2023, Defendants reported the Data Breach to the California Attorney General.

51.     Pursuant to California Civ. Code § 1798.82(a)(1), data breach notification letters must be sent to residents of California "whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person" due to a "breach of the security of the system[.]"

52.     Defendants' sample data breach notification letter was filed with the Attorney General of California in accordance with California Civ. Code § 1798.82(f).

---

[30]     https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity/ransomware-fact-sheet/index.html

BLOOD HURST & O' REARDON, LLP

53. Plaintiff's and Class members' PII/PHI is "personal information" as defined by California Civ. Code § 1798.82(h).

54. California Civ. Code § 1798.82(g) defines "breach of the security of the system" as the "unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of personal information maintained by the person or business."

55. The Data Breach was a "breach of the security of the system" as defined by California Civ. Code § 1798.82(g).

56. Thus, Defendants filed and disseminated its breach notification because Plaintiff's and Class members' unencrypted personal information was acquired by an unauthorized person or persons as a result of the Data Breach.

57. On February 1, 2023, Defendants also filed a notice with the U.S. Department of Health and Human Services Office for Civil Rights indicating a "Hacking/IT Incident" of unsecured protected health information of 3,300,638 individuals.

58. The breach report filed by Defendants with the Secretary of the U.S. Department of Health and Human Services was filed in accordance with 45 CFR § 164.408(a). Pursuant to 45 CFR § 164.408(a), breach reports are filed with the Secretary of the U.S. Department of Health and Human Services "following the discovery of a breach of unsecured protected health information."

59. 45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

60. 45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

00199845

BLOOD HURST & O' REARDON, LLP

61.     Plaintiff and Class members began receiving individual notice sometime after February 1, 2023. Plaintiff did not receive notice until February 6, 2023.

62.     The Data Breach notice acknowledges the potential harms Plaintiff and the other Class members face by recommending that Plaintiff and Class members take several steps, including registering for a fraud alert and "[m]onitor[ing] account statements, Explanation of Benefit forms, and credit bureau reports closely." However, Defendants fail to provide any adequate mitigating protection.

63.     Defendants' notice of the Data Breach also is inadequate because it fails to provide sufficient detail to Plaintiff and Class members about who accessed their PII/PHI and what specific PII/PHI was accessed. While Defendants confirm that an investigation revealed that ransomware was used by a cybercriminal to "access and exfiltrate" PII/PHI from Defendants' servers, the notice only provides general categories of PII/PHI without any specificity to each Class member or what happened with the ransomware attack. Defendants' failure to provide a detailed description of what PII/PHI was accessed by the unauthorized user(s) has left Plaintiff and Class members in the dark. By failing to adequately inform Plaintiff and Class members of the exact information that was breached and the details surrounding the breach Plaintiff and Class members are unable to adequately protect themselves against medical and identity theft.

***Defendants Knew or Should Have Known PII/PHI Are High Risk Targets***

64.     Defendants knew or should have known that PII and PHI are high risk targets for identity thieves. In 2014, the FBI informed that "[c]yber actors will likely increase cyber intrusions against healthcare systems" and warned that the

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

"healthcare industry is not technically prepared to combat against cyber criminals' basic cyber intrusion tactics, techniques and procedures[.]"[31]

65.    The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[32]

66.    The Identity Theft Resource Center reported that the Medical/Healthcare sector had the second largest number of breaches in 2018 and the highest rate of exposure per breach. According to the ITRC this sector suffered 363 data breaches exposing over 9 million records in 2018.[33] These included Blue Cross Blue Shield of Michigan (15K records exposed), Atrium Health (over 2M records exposed), UnityPoint Health (over 1M records), LifeBridge Health (over 500K), FastHealth Corporation (over 600K records), among others.

67.    As discussed above, the U.S. Department of Health and Human Services also specifically warns about malware, including ransomware, attacks.

---

[31]    *See* FBI CYBER DIVISION, (U) HEALTH CARE SYSTEMS AND MEDICAL DEVICES AT RISK FOR INCREASED CYBER INTRUSIONS FOR FINANCIAL GAIN, *supra*.

[32]    Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n (Oct. 4, 2019), https://www.ama-assn.org/practice-management/ sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

[33]    Identity Theft Resource Center, 2018 End-of-Year Data Breach Report 2, *available at* https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

BLOOD HURST & O' REARDON, LLP

00199845

68.     As such, Defendants were aware that PHI is at high risk of theft, and consequently should have but did not take appropriate and standard measures to protect Plaintiffs' and Class members' PII/PHI against cyber-security attacks.

## CLASS DEFINITION AND ALLEGATIONS

69.     Pursuant to Federal Rules of Civil Procedure 23, Plaintiff seeks certification of a class defined as:  All persons who received notice of the Data Breach.

70.     Excluded from the Class is: (1) Defendants and their officers, directors, employees, principals, affiliated entities, controlling entities, agents, and other affiliates; (2) the agents, affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such persons or entities described herein; and (3) the Judge(s) assigned to this case and any members of their immediate families.

71.     Certification of Plaintiff's claims for classwide treatment is appropriate because Plaintiff can prove the elements of his claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

72.     Numerosity, Fed R. Civ. P. 23(a)(1): The Class is so numerous that joinder of all members is impracticable. Defendants have identified more than 3.3 million individuals whose PII/PHI may have been improperly accessed in the Data Breach, and the Class is apparently identifiable within Defendants' records.

73.     Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class members. These include:

> a. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the PII/PHI it collected from Plaintiff and Class members;

BLOOD HURST & O' REARDON, LLP

00199845

CLASS ACTION COMPLAINT

b. Whether Defendants breached their duties to protect the PII/PHI of Plaintiff and each Class member; and

c. Whether Plaintiff and each Class member are entitled to damages and equitable relief.

74.     Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class members because all had their PII/PHI compromised as a result of the Data Breach, due to Defendants' misfeasance.

75.     Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

76.     Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class members in that he has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages he has suffered are typical of other Class members. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

77.     Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a

large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

78.    The nature of this action and the nature of laws available to Plaintiff and Class members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

79.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

80.    Adequate notice can be given to Class members directly using information maintained in Defendants' records.

81.    Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the PII/PHI of Class members, Defendants may

BLOOD HURST & O' REARDON, LLP

00199845

continue to refuse to provide proper notification to Class members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

82. Further, Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

## **COUNT I**

**Violation of the California Consumer Privacy Act of 2018 ("CCPA") Cal. Civ. Code §§ 1798.100, *et seq.***

83. Plaintiff realleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

84. As more personal information about consumers is collected by businesses, consumers' ability to properly protect and safeguard their privacy has decreased. Consumers entrust businesses with their personal information on the understanding that businesses will adequately protect it from unauthorized access. The California Legislature explained: "The unauthorized disclosure of personal information and the loss of privacy can have devasting effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm."[34]

85. As a result, in 2018, the California Legislature passed the CCPA, giving consumers broad protections and rights intended to safeguard their personal information. Among other things, the CCPA imposes an affirmative duty on businesses that maintain personal information about California residents to implement and maintain reasonable security procedures and practices that are

---

[34] CALIFORNIA CONSUMER PRIVACY ACT (CCPA) COMPLIANCE, https://buyergenomics.com/ccpa-complience/.

BLOOD HURST & O'REARDON, LLP

CLASS ACTION COMPLAINT

appropriate to the nature of the information collected. Defendant failed to implement such procedures which resulted in the Data Breach.

86.    Section 1798.150(a)(1) of the CCPA provides: "Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

87.    Plaintiff is a "consumer" as defined by Civ. Code § 1798.140(g) because he is "a natural person who is a California resident, as defined in Section 17014 of Title 18 of the California Code of Regulations, as that section read on September 1, 2017."

88.    Defendants are "business[es]" as defined by Civ. Code § 1798.140(c) because Defendants:

    a. are a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners";

    b. "collects consumers' personal information, or on the behalf of which is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information";

    c. do business in and is headquartered in California; and

    d. have annual gross revenues in excess of $25 million; annually buys, receives for the business' commercial purposes, sells or shares for commercial purposes, alone or

BLOOD HURST & O' REARDON, LLP

00199845

in combination, the personal information of 50,000 or more consumers, households, or devices; or derives 50 percent or more of its annual revenues from selling consumers' personal information.

89.     Plaintiffs' PII was subject to unauthorized access and exfiltration, theft or disclosure because their PII, including name and contact information, was subject to unauthorized access and exfiltration, theft, or disclosure.

90.     Plaintiffs' PII was in nonencrypted and nonredacted form, allowing criminals full access to it.

91.     The Data Breach occurred as a result of Defendant's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information. Defendant failed to implement reasonable security procedures to prevent phishing attacks and to prevent unauthorized access of Plaintiffs' and Class members' PII as a result of phishing attacks.

92.     Plaintiff has or will provide notice of Defendants' violations of the CCPA pursuant to Civil Code § 1798.150(b)(1). Although a cure is not possible under the circumstances, if as expected Defendants are unable to cure or do not cure the violations within 30 days of notice, Plaintiff will amend this complaint to pursue actual or statutory damages as permitted by Civil Code § 1798.150(a)(1)(A).

93.     As a result of Defendants' failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, Plaintiff seeks actual damages, injunctive and declaratory relief, and any other relief as deemed appropriate by the Court.

///

///

///

///

CLASS ACTION COMPLAINT

00199845

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

## COUNT II

### Violation of the California Confidentiality of Medical Information Act ("CMIA")

### (Cal. Civ. Code §§ 56, *et seq.*)

94.     Plaintiff re-alleges and incorporate by reference all proceeding paragraphs as if fully set forth herein.

95.     Plaintiff alleges Count II in the alternative to Count I.

96.     Section 56.10(a) of the California Civil Code provides that "[a] provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization[.]" Defendants have represented that all of the information involved in the breach falls within the CMIA and, as a result, none of it falls within the California Consumer Privacy Act.

97.     Defendants are a "provider of health care" within the meaning of Civil Code § 56.06 and/or a "business organized for the purpose of maintaining medical information" and/or a "business that offers software or hardware to consumers . . . that is designed to maintain medical information" within the meaning of Civil Code § 56.06(a) and (b), and maintained and continues to maintain "medical information," within the meaning of Civil Code § 56.05(j), for "patients" of Defendants, within the meaning of Civil Code § 56.05(k).

98.     Plaintiff and all members of the Class are "patients" within the meaning of Civil Code § 56.05(k) and are "endanger[ed]" within the meaning of Civil Code § 56.05(e) because Plaintiff and the Class fear that disclosure of their medical information could subject them to harassment or abuse.

99.     Plaintiff and the respective Class members, as patients, had their individually identifiable "medical information," within the meaning of Civil Code

00199845

§ 56.05(j), created, maintained, preserved, and stored on Defendants' servers at the time of the breach.

100.   Defendants, through inadequate security, allowed an unauthorized third-party or parties to access Plaintiff's and each Class members' medical information, without the prior written authorization of Plaintiff and the Class members, as required by Civil Code § 56.10 of the CMIA.

101.   In violation of Civil Code § 56.10(a), Defendants disclosed Plaintiff's and Class members' medical information without first obtaining an authorization. Plaintiff's and Class members' medical information was viewed by unauthorized individuals as a direct and proximate result of Defendants' violation of Civil Code § 56.10(a).

102.   In violation of Civil Code § 56.10(e), Defendants further disclosed Plaintiff's and Class members' medical information to persons or entities not engaged in providing direct health care services to Plaintiff or Class members or their providers of health care or health care service plans or insurers or self-insured employers.

103.   Defendants violated Civil Code § 56.101 of the CMIA through its failure to maintain and preserve the confidentiality of the medical information of Plaintiff and the Class.

104.   In violation of Civil Code § 56.101(a), Defendants created, maintained, preserved, stored, abandoned, destroyed, or disposed of Plaintiff's and Class members' medical information in a manner that failed to preserve and breached the confidentiality of the information contained therein. Plaintiff's and Class members' medical information was viewed by unauthorized individuals as a direct and proximate result of Defendants' violation of Civil Code § 56.101(a).

105.   In violation of Civil Code § 56.101(a), Defendants negligently created, maintained, preserved, stored, abandoned, destroyed, or disposed of Plaintiff's and Class members' medical information. Plaintiff's and Class

BLOOD HURST & O' REARDON, LLP

00199845

1  members' medical information was viewed by unauthorized individuals as a direct
2  and proximate result of Defendants' violation of Civil Code § 56.101(a).

3      106.  Plaintiff's and Class members' medical information that was the
4  subject of the Data Breach included "electronic medical records" or "electronic
5  health records" as referenced by Civil Code § 56.101(c) and defined by 42 U.S.C.
6  § 17921(5).

7      107.  In violation of Civil Code § 56.101(b)(1)(A), Defendants' electronic
8  health record system or electronic medical record system failed to protect and
9  preserve the integrity of electronic medical information. Plaintiff's and Class
10  members' medical information was viewed by unauthorized individuals as a direct
11  and proximate result of Defendants' violation of Civil Code § 56.101(b)(1)(A).

12      108.  The breached data, which included Plaintiff's and Class members'
13  PII/PHI, was in unencrypted and nonredacted form, allowing criminals to view
14  and use it.

15      109.  Defendants violated Civil Code § 56.36 of the CMIA through its
16  failure to maintain and preserve the confidentiality of the medical information of
17  Plaintiff and the Class.

18      110.  As a result of Defendants' above-described conduct, Plaintiff and the
19  Class have suffered damages from the unauthorized disclosure and release of their
20  individual identifiable "medical information" made unlawful by Civil Code
21  §§ 56.10, 56.101, 56.36.

22      111.  As a direct and proximate result of Defendants' above-described
23  wrongful actions, inaction, omissions, and want of ordinary care that directly and
24  proximately caused the Data Breach, and violation of the CMIA, Plaintiff and the
25  Class members have suffered (and will continue to suffer) economic damages and
26  other injury and actual harm in the form of, *inter alia*, (i) an imminent, immediate
27  and the continuing increased risk of identity theft, identity fraud and medical fraud
28  – risks justifying expenditures for protective and remedial services for which they

BLOOD HURST & O' REARDON, LLP

00199845

are entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII/PHI, (iv) statutory damages under the CMIA, (v) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vi) the financial and temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

112.   Plaintiff, individually and for each member of the Class, seeks nominal damages of one thousand dollars ($1,000) for each violation under Civil Code § 56.36(b)(1), and actual damages suffered, if any, pursuant to Civil Code § 56.36(b)(2), injunctive relief, as well as punitive damages of up to $3,000 per Plaintiff and each Class member, and attorneys' fees, litigation expenses and court costs, pursuant to Civil Code § 56.35.

## COUNT III

### Violation of the California Customer Records Act
### Cal. Civ. Code §§ 1798.80, *et seq.* ("CRA")

113.   Plaintiff realleges and incorporates all proceeding paragraphs as if fully set forth herein.

114.   "[T]o ensure that personal information about California residents is protected," the California legislature enacted Civil Code § 1798.81.5, which requires that any business that "owns or licenses personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

115.   By failing to implement reasonable measures to protect the Plaintiff's and Class members' PII/PHI, Defendants violated Civil Code § 1798.81.5.

116.   In addition, by failing to promptly notify all affected Class members that their PII/PHI had been exfiltrated, Defendants violated Civil Code § 1798.82.

BLOOD HURST & O' REARDON, LLP

00199845

117.  As a direct or proximate result of Defendants' violations of Civil Code §§ 1798.81.5 and 1798.82, Plaintiff and Class members were (and continue to be) injured and have suffered (and will continue to suffer) the damages and harms described herein.

118.  In addition, by violating Civil Code §§ 1798.81.5 and 1798.82, Defendants "may be enjoined" under Civil Code Section 1798.84(e).

119.  Defendants' violations of Civil Code §§ 1798.81.5 and 1798.82 also constitute unlawful acts or practices under the UCL, which affords the Court discretion to enter whatever orders may be necessary to prevent future unlawful acts or practices.

## COUNT IV

**Violation of the California Unfair Competition Law ("UCL")**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

120.  Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

121.  The UCL prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendants engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the UCL.

122.  In the course of conducting its business, Defendants committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class members' PII/PHI, and by violating the statutory and common law alleged herein, including, *inter alia*, California's Confidentiality of Medical Information Act (Civ. Code

BLOOD HURST & O' REARDON, LLP

§§ 56.10(a), (e); 56.101(a), 56.101(b)(1)(A); 56.36), California Consumer Privacy Act of 2018 (Cal. Civ. Code § 1798.150(a)(1)), California Customer Records Act (Cal. Civ. Code § 1798.80 et seq.), the Health Insurance Portability and Accountability Act of 1996, (42 U.S.C. § 1302d; 45 C.F.R. §§ 164.306(a), (d), (e); 164.308(a); 164.312(a), (d), (e); 164.316(a), (b)), and Article I, Section 1 of the California Constitution (California's constitutional right to privacy). Plaintiff and Class members reserve the right to allege other violations of law by Defendants constituting other unlawful business acts or practices. Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

123.   Defendants also violated the UCL's unlawful prong by breaching contractual obligations created by their privacy policies and by knowingly and willfully or, in the alternative, negligently and materially violating Cal. Bus. & Prof. Code § 22576, which prohibits a commercial website operator from "knowingly and willfully" or "negligently and materially" failing to comply with the provisions of its posted privacy policy. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendants' violations of their privacy policies.

124.   Defendants violated the UCL by failing to adequately and timely notify Plaintiff and Class members regarding the unauthorized release and disclosure of their PII/PHI. If Plaintiff and Class members had been adequately and timely notified in an appropriate fashion, they could have taken precautions to safeguard and protect their PII/PHI, medical information, and identities.

125.   Defendants' above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendants' wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and

unscrupulous. Defendants' practices are also contrary to legislatively declared and public policies that seek to protect PII/PHI and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as the CRA, CCPA, CMIA, Article I, Section 1 of the California Constitution (California's constitutional right to privacy), HIPAA, and the Federal Trade Commission Act ("FTC Act") (15 U.S.C. § 45). The gravity of Defendants' wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct.

126.  Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendants' violations of its privacy policies and statutory and common law in that a portion of the money Plaintiff and Class members paid for Defendants' services went to fulfill the contractual obligations set forth in Defendants' privacy policies, including maintaining the security of their PHI, and Defendants' legal obligations and Defendants failed to fulfill those obligations.

127.  The UCL also prohibits any "fraudulent business act or practice." Defendants' above-described claims, nondisclosures and misleading statements were false, misleading and likely to deceive the consuming public in violation of the UCL.

128.  As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and its violations of the UCL, Plaintiff and Class members have suffered injury in fact and lost money or property as a result of Defendants' unfair and deceptive conduct. Such injury includes paying for a certain level of security for their PII/PHI but receiving a lower level, paying more for Defendants' services than they otherwise would have had they known Defendants were not providing reasonable security in conformance with its legal obligations. Had Plaintiff and Class members known about Defendants'

BLOOD HURST & O' REARDON, LLP

00199845

substandard data security practices they would not have used Defendants' services or would have paid less for them. Defendants' security practices have economic value in that reasonable security practices reduce the risk of theft of customer's PII/PHI.

129.   Plaintiff and Class members have also suffered (and will continue to suffer) loss of money and other injury and actual harm in the form of, *inter alia*, (i) an imminent, immediate and the continuing increased risk of identity and medical theft and identity and medical fraud which require paying for protective and remedial services for which they are entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII/PHI, (iv) statutory damages under the CMIA, (v) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vi) the financial and temporal cost of monitoring their credit, monitoring financial accounts, and mitigating damages.

130.   Unless restrained and enjoined, Defendants will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiff, therefore, on behalf of himself, Class members, and the general public, also seeks restitution and an injunction prohibiting Defendants from continuing such wrongful conduct, and requiring Defendants to modify their corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII/PHI entrusted to it, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203.

## COUNT V

### Breach of Implied Contract

131.   Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

BLOOD HURST & O' REARDON, LLP

00199845

132.   Plaintiff and Class members entrusted their PII/PHI to Defendants. In so doing, Plaintiff and Class members entered into implied contracts with Defendants by which Defendants agreed to adequately safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and Class members if their data had been breached and compromised or stolen.

133.   In their privacy policies, Defendants represented that they adequate implemented security measures to protect their patients' PII/PHI.

134.   Plaintiff and the Class members fully performed their obligations under the implied contracts with Defendants.

135.   Defendants breached the implied contracts they made with Plaintiff and Class members by failing to safeguard and protect their PII/PHI.

136.   As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiff and Class members have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity and medical theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity and medical theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality and privacy of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent implementing a credit freeze, on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

137.   As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiff and Class members are entitled to recover actual, consequential, and nominal damages.

00199845

BLOOD HURST & O' REARDON, LLP

Blood Hurst & O' Reardon, LLP

## COUNT VI

### Unjust Enrichment

138. Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

139. Plaintiff and Class members conferred a monetary benefit on Defendants by paying for healthcare services from Defendants, thereby providing Defendants with their valuable PII/PHI.

140. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class members' PII/PHI.

141. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid its data security obligations at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

142. Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

143. Defendants acquired the monetary benefit and PII/PHI through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

144. If Plaintiff and Class members knew that Defendants had not secured their PII/PHI, they would not have agreed to provide their PII/PHI to Defendants.

145. Plaintiff and Class members have no adequate remedy at law.

146. As a direct and proximate result of Defendants' conduct, Plaintiff and Class members have suffered and will suffer injury, including but not limited to:

(i) actual identity and medical theft; (ii) the loss of the opportunity how their PII/PHI is used; (iii) the compromise, publication, and/or theft of their PII/PHI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, medical theft, and/or unauthorized use of their PII/PHI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity and medical theft; (vi) the continued risk to their PII/PHI, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect PII/PHI in their continued possession and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII/PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class members.

147. As a direct and proximate result of Defendants' conduct, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm.

148. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that they unjustly received from them.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all members of the Class respectfully request that (i) this action be certified as a class action, (ii) Plaintiff be designated representative of the Class, (iii) Plaintiff's counsel be appointed as counsel for the Class. Plaintiff, on behalf of himself and members of the Class further request that upon final trial or hearing, judgment be awarded against Defendants for:

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00199845

1     (i)     actual and punitive damages to be determined by the trier of
2     fact;

3     (ii)    equitable relief, including restitution;

4     (iii)   pre- and post-judgment interest at the highest legal rates
5     applicable;

6     (iv)    appropriate injunctive relief;

7     (v)     attorneys' fees and litigation expenses under Code of Civil
8     Procedure § 1021.5 and other applicable law;

9     (vi)    costs of suit; and

10    (vii)   such other and further relief the Court deems just and proper.

11    ## DEMAND FOR JURY TRIAL

12    Plaintiff hereby demands a jury trial on all issues so triable.

Respectfully submitted,

Dated: February 21, 2023

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
PAULA R BROWN (254142)
JENNIFER L. MACPHERSON (202021)

By:     *s/ Timothy G. Blood*
TIMOTHY G. BLOOD

501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
pbrown@bholaw.com
jmacpherson@bholaw.com

*Attorneys for Plaintiff*

**BLOOD HURST & O' REARDON, LLP**

00199845

35
CLASS ACTION COMPLAINT